UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

AMERICA FIRST LEGAL FOUNDATION,

        Plaintiff,

    v.

CENTERS FOR DISEASE CONTROL AND
PREVENTION,

        Defendant.

---

Civil Action No. 22-0978 (APM)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>**TABLE OF CONTENTS**</u>

BACKGROUND ................................................................................................................. 2

LEGAL STANDARDS ...................................................................................................... 3

ARGUMENT ..................................................................................................................... 5

  I.    Defendant's Withholdings Pursuant to Exemption 4 Are Appropriate. ............................ 6

      A.    CDC's Brand Lift Withholdings Are Appropriate. ......................................................... 8

      B.    CDC's CrowdTangle Withholdings Are Appropriate................................................. 10

  II.    Defendant's Withholdings Pursuant to Exemption 5 Are Appropriate. ........................... 13

      A.    The Withholdings for the Meeting Agendas of the Interagency Policy Committee and Sub-Interagency Policy Committee Are Appropriate. .................................................. 16

      B.    The Withholdings Related to the United Kingdom Briefing Agenda Are Appropriate. ................................................................................................................................... 20

      C.    The Withholdings Relating to the Summary of Conclusions Are Appropriate. .......... 21

  III.    Defendant's Withholdings Pursuant to Exemption 6 Are Appropriate............................ 26

  IV.    Defendant Has Disclosed All Reasonably Segregable Material. ...................................... 28

CONCLUSION................................................................................................................. 29

### TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Ctr. for L. & Just. v. Dep't of Just.*,
    325 F. Supp. 3d 162 (D.D.C. 2018) ...................................................... 26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................... 3, 4

*Baker & Hostetler LLP v. Dep't of Com.*,
    473 F.3d 312 (D.C. Cir. 2006) ............................................................ 6

*Brayton v. Off. of U.S. Trade Rep.*,
    641 F.3d 521 (D.C. Cir. 2011) ............................................................ 4

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
    40 F.R.D. 318 (D.D.C. 1966) ........................................................... 14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................... 3, 4

*Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    600 F. Supp. 114 (D.D.C. 1984) ....................................................... 15

*Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec.*,
    648 F. Supp. 2d 152 (D.D.C. 2009) ................................................... 14

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
    58 F.4th 1255 (D.C. Cir. 2023) ...................................................... 9, 11

*Citizens for Resp. & Ethics in Wash. v. Dep't of Lab.*,
    478 F. Supp. 2d 77 (D.D.C. 2007) ................................................... 4, 6

*Cleveland v. United States*,
    128 F. Supp. 3d 284 (D.D.C. 2015) ................................................... 14

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980)........................................................... 14

*Dep't of Def. v. Fed. Lab. Rels. Auth.*,
    510 U.S. 487 (1994) ....................................................................... 5

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001) ........................................................................ 14

*Dep't of Just. v. Tax Analysts*,
    492 U.S. 136 (1989) ....................................................................... 5

*DiBacco v. U.S. Army*,
    795 F.3d 178 (D.C. Cir. 2015) .......................................................... 11

\*  *Flyers Rights Educ. Fund, Inc. v. Fed. Aviation Admin.*,
     71 F.4th 1051 (D.C. Cir. 2023) ............................................................. 8, 9, 10, 12

\*  *Food Mktg. Inst. v. Argus Leader Media*,
     139 S. Ct. 2356 (2019) ...................................................................... 6, 7, 9, 12

   *FPL Grp. Inc. v. IRS*,
     698 F. Supp. 2d 66 (D.D.C. 2010) ............................................................... 14

   *In re Sealed Case*,
     121 F.3d 729 (D.C. Cir. 1997) ..................................................................... 14

   *Jud. Watch, Inc. v. Dep't of Just.*,
     20 F.4th 49 (D.C. Cir. 2021) ........................................................................ 14

   *King v. Dep't of Just.*,
     Civ. A. No. 15-1445 (RDM), 2021 WL 3363406 (D.D.C. Aug. 3, 2021) ...................... 26-27

   *Kowal v. Dep't of Just.*,
     --- F.4th ---, Nos. 22-5231, 22-5287, 2024 WL 3418844 (D.C. Cir. July 16, 2024)............. 4-5

   *Larson v. Dep't of State*,
     565 F.3d 857 (D.C. Cir. 2009) ....................................................................... 4

   *Leopold v. Dep't of Just.*,
     94 F.4th 33 (D.C. Cir. 2024) ........................................................................ 28

\*  *Machado Amadis v. Dep't of State*,
     971 F.3d 364 (D.C. Cir. 2020) ....................................................... 18, 20, 21, 23

   *Mapother v. Dep't of Just.*,
     3 F.3d 1533 (D.C. Cir. 1993) ......................................................................... 13

   *McCutchen v. Dep't of Health & Hum. Servs.*,
     30 F.3d 183 (D.C. Cir. 1994) ......................................................................... 5

   *McGehee v. CIA*,
     697 F.2d 1095 (D.C. Cir. 1983) ..................................................................... 4

   *Mead Data Cent., Inc. v. Dep't of Air Force*,
     566 F.2d 242 (D.C. Cir. 1977) ....................................................................... 5

   *Media Rsch. Ctr. v. Dep't of Just.*,
     818 F. Supp. 2d 131 (D.D.C. 2011) ................................................................ 4

   *Mil. Audit Project v. Casey*,
     656 F.2d 724 (D.C. Cir. 1981) .................................................................... 4, 6

   *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
     421 U.S. 132 (1975) ........................................................................ 13, 14, 15

*Nat'l Treas. Emps. Union v. U.S. Customs Serv.*,
    802 F.2d 525 (D.C. Cir. 1986) ................................................................ 5

*Peralta v. U.S. Att'ys Off.*,
    136 F.3d 169 (D.C. Cir. 1998) ................................................................ 1

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
    57 F.4th 1061 (D.C. Cir. 2023) ............................................................. 28

*Petrol. Info. Corp. v. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992) ..................................................... 13, 14

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    185 F.3d 898 (D.C. Cir. 1999) ................................................................ 5

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    704 F.2d 1280 (D.C. Cir. 1983) ............................................................. 6

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ............................................................... 13

*Rockwell Int'l Corp. v. Dep't of Just.*,
    235 F.3d 598 (D.C. Cir. 2001) ............................................................. 13

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 4

*Shapiro v. Dep't of Just.*,
    239 F. Supp. 3d 100 (D.D.C. 2017) ................................................ 27, 28

*Spirko v. U.S. Postal Serv.*,
    147 F.3d 992 (D.C. Cir. 1998) ................................................................ 6

*Stein v. CIA*,
    454 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 26

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ........................................................... 28

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ................................................................ 5

*Winston & Strawn, LLP v. McLean*,
    843 F.3d 503 (D.C. Cir. 2016) ............................................................. 26

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ................................................................ 5

## Statutes

5 U.S.C. § 552 ........................................................................ 1, 5, 6, 13, 20

**Rules**

Fed. R. Civ. P. 1 .................................................................................................... 26

Fed. R. Civ. P. 56 .................................................................................................... 3

**Regulations**

45 C.F.R. § 5.42 .................................................................................................... 8

Defendant, the Centers for Disease Control and Prevention ("CDC"),[1] respectfully submits this memorandum in support of its motion for summary judgment.

The parties to this Freedom of Information Act ("FOIA") litigation have worked cooperatively throughout the course of this proceeding to address each other's issues and narrow the issues for the Court. As narrowed, the question on summary judgment is the propriety of certain Exemption 4 and 5 withholdings. *See* Jt. Status Rep. (ECF No. 16) ¶ 3 ("The issues remaining in this case pertain to the propriety of certain redactions that the CDC has made."). "On March 28, 2024, Plaintiff identified the withholdings in the CDC's draft Vaughn indices that remain in dispute. Specifically, within the CDC's two draft Vaughn indices, Plaintiff is challenging: (i) all (b)(4) withholdings relating to Crowdtangle and Brandlift; (ii) all (b)(5) deliberative process withholdings; and (iii) all (b)(6) withholdings as it applies to names only (including names appearing in email addresses when the name does not otherwise appear unredacted)." Jt. Status Rep. (ECF No. 24) ¶ 4. Further processing occurred thereafter, with the CDC lifting additional withholdings. *See* Declaration of Roger Andoh ("Andoh Decl.," attached) ¶¶ 13–14. In addition, the Andoh Declaration provides the names requested for the remaining Exemption 6 withholdings. *See id.* ¶¶ 19, 21. Accordingly, the CDC understands that all issues pertaining to Exemption 6 are now resolved.

For the reasons described below and in the CDC's declarations and supporting materials, the CDC properly invoked FOIA Exemptions 4 and 5 in response to Plaintiff's FOIA request, and it respectfully requests that the Court enter summary judgment in its favor.

---

[1]     The proper defendant in this case is the Department of Health and Human Services, but governing precedent requires no alteration of the named defendant, which is a component of that Department. 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552(f)(1); *see Peralta v. U.S. Att'ys Off.*, 136 F.3d 169, 173–74 (D.C. Cir. 1998).

## BACKGROUND

On July 16, 2021, Plaintiff submitted the FOIA request at issue in this action.  Compl. (ECF

No. 1) ¶ 18.  Plaintiff's request seeks the following twelve categories of records:

1.    All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, of, regarding, referring, or relating to any efforts to flag COVID-19 or COVID-19 vaccine related "misinformation" or "disinformation" to any social media company, including but not limited to Facebook, Twitter, TikTok, Instagram, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest. The timeframe for this request is January 20, 2021, to date the records request is processed.

2.    All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes sufficient to show any and all communications with any social media company, including but not limited to Facebook, Twitter, TikTok, Instagram, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest, regarding any efforts to flag COVID-19 or COVID-19 vaccine related "misinformation" or "disinformation". The timeframe for this request is January 20, 2021, to date the records request is processed.

3.    All records, including, but not limited to, communications with any email address for a White House office or individual serving in the White House, including those ending in "@who.eop.gov" or "@nsc.eop.gov" of, regarding, or relating to the "flagging" of "disinformation" to any social media company, including but not limited to Facebook, Twitter, Instagram, TikTok, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest. The timeframe for this request is January 20, 2021, to date the records request is processed.

4.    All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes sufficient to show how CDC and/or the Administration will determine the veracity of any given post.

5.    All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, sufficient to show who will decide what is "misinformation" and the basis on which they will make that determination.

6.    All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, sufficient to show who will decide what is "disinformation" and the basis on which they will make that determination.

7.    All communications with any email address ending in "@facebook.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

8.    All communications with any email address ending in "@twitter.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

9.    All communications with any email address ending in "@instagram.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

10.   All communications with any email address ending in "@youtube.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

11.   All records sufficient to show the identities of every natural or legal person engaged in "disinformation research and tracking" referenced by Ms. Psaki.

12.   All records sufficient to show the identities of each of the "members of our senior staff" referenced by Ms. Psaki.

Pl.'s FOIA Request (ECF No. 1-1) at 2–3.  Defendant made rolling productions, beginning July 6, 2022.  Jt. Status Rep. (ECF No. 12) ¶ 2.  The parties worked together over the course of the proceedings and were able to resolve many of their disagreements.  *See* Andoh Decl. ¶¶ 11–21. Now, "[t]he issues remaining in this case pertain to the propriety of certain redactions that the CDC has made."  Jt. Status Rep. (ECF No. 16) ¶ 3.  Those withholdings were identified on draft *Vaughn* indices that Defendant provided during the parties' negotiations.  *See* Jt. Status Rep. (ECF No. 24) ¶ 4; *see also* Exemption 5 *Vaughn* Index (Ex. 1); Exemption 4 *Vaughn* Index (Ex. 2).

Defendant has now moved for summary judgment, relying on the Declarations of CDC's Roger Andoh ("Andoh Decl.") and Meta Platforms, Inc.'s ("Meta") Carrie Adams ("Adams Decl.") and supporting materials.

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the party moving for summary

judgment to demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. A genuine issue is one that "might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment[.]" *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment."). A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted); *accord Kowal v.*

*Dep't of Just.*, --- F.4th ---, Nos. 22-5231, 22-5287, 2024 WL 3418844, at *2 (D.C. Cir. July 16, 2024).

## ARGUMENT

As explained below, Defendant has properly withheld material responsive to Plaintiff's FOIA request under Exemptions 4 and 5 (deliberative process).

FOIA does not allow the public to have unfettered access to government files. *McCutchen v. Dep't of Health & Hum. Servs.*, 30 F.3d 183, 184 (D.C. Cir. 1994). Although disclosure is the dominant objective of FOIA, there are several exemptions to the statute's disclosure requirements. *Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 494 (1994). FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions. 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51 (1989). To protect materials from disclosure, the agency must show that they come within one of the FOIA exemptions. *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

An agency may meet its burden to establish the applicability of an exemption by providing a *Vaughn* index that "permit[s] adequate adversary testing of the agency's claimed right to an exemption." *Nat'l Treas. Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986); *see also Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973). The index must contain "an adequate description of the records" and "a plain statement of the exemptions relied upon to withhold each record." *Nat'l Treas.*, 802 F.2d at 527 n.9.

Additionally, although a *Vaughn* index is a common device used by agencies to meet their burden of proof, "the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW*, 478 F. Supp. 2d at 80 (quoting *Mil. Audit Project*, 656 F.2d at 738); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998).

## I.  Defendant's Withholdings Pursuant to Exemption 4 Are Appropriate.

FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings" and are protected so long as the submitter of the information has a "commercial interest" in them. *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983); *see also Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006). Such information is "confidential" under Exemption 4 if it is "customarily kept private, or at least closely held, by the person imparting it." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019). In *Argus Leader*, the Supreme Court held that commercial or financial information is "confidential" within the meaning of Exemption 4 "[a]t least" where the information is "customarily and actually treated as private by its owner" and, perhaps, "provided to the government under an assurance of privacy." *Id.* at 2366. As demonstrated below, the CDC properly withheld under Exemption 4 the confidential commercial information that Meta submitted to the government.

The Exemption 4 withholdings in question appear on pages 110, 120–22, 137–38, 148–49, 199, 219, 226–37, 244–55, 262–72, 294, 296–304, and 315–25 of Exhibit 4.  *See* Andoh Decl. ¶¶ 20(a), 29; *see also* Exemption 4 *Vaughn* Documents (Ex. 4).[2]  These withholdings fall into two categories: (1) Brand Lift-related withholdings concerning pricing, terms, and other business information (i.e., pages 110, 120–22, 137–38, and 148–49); and (2) CrowdTangle materials (i.e., pages 199, 219, 226–37, 244–55, 262–72, 294, 296–304, and 315–25).  Andoh Decl. ¶¶ 29, 35–44. Except for the CrowdTangle reports (i.e., pages 226–36, 244–54, 262–72, 294, 296–304, and 315–25, as well as pages 199, 219, and 255 parroting those reports), which could not be further segregated without causing foreseeable harm, *see id.* ¶ 96, CDC has wielded Exemption 4 with the finest of scalpels, redacting only tiny portions of the remaining documents (i.e., pages 110, 120–22, 137–38, 148–49).  *See generally* Exemption 4 *Vaughn* Documents (Ex. 4).

As a preliminary matter, CDC notes that Meta understood when it provided its materials to CDC initially that CDC would hold this information in confidence.  *See* Adams Decl. ¶ 6 ("I understand that the Government will continue to assert the applicability of Exemption 4 over [the information at issue]."); *see also* Meta's Ltr. (Ex. 5, attached) at 1 ("Meta respectfully requests that the CDC continue to maintain the confidentiality of this information for the reasons set forth in the declaration.").  Although the Supreme Court has not ruled on whether confidential information can lose its confidential character if communicated to the government without assurance of confidentiality, there is no need to resolve that question here, as there is no question that Meta understood that its information would continue to be treated as confidential when it was provided to the government.  *See Argus Leader*, 139 S. Ct. at 2363 ("Can privately held

---

[2]    To ensure that the pagination matches, Defendant has omitted exhibit cover sheets for its productions (Exhibit 3 and Exhibit 4) and has included an exhibit stamp in the header on the first pages.

information lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private? As it turns out, there's no need to resolve that question in this case because the retailers before us clearly satisfy this condition too.  Presumably to induce retailers to participate in SNAP and provide store-level information it finds useful to its admin[i]stration of the program, the government has long promised them that it will keep their information private.").  Indeed, regulation required CDC to provide predisclosure notification because the information at issue "could reasonably be considered exempt under Exemption 4."  45 C.F.R. § 5.42(a).  CDC accordingly engaged in an extended "back-and-forth process" with Meta, in compliance with its predisclosure notification requirement, for "well over a year" once this information was requested under FOIA.  Andoh Decl. ¶ 31.

### A.    CDC's Brand Lift Withholdings Are Appropriate.

Moving on to the documents at hand, CDC begins with the Brand Lift documents.  Brand Lift is a kind of lift test that Meta employs where brand polling and other brand awareness measurements are used to help understand the true value of ads on Meta and how well they perform independent of other marketing efforts.  Andoh Decl. ¶ 37.  Brand Lift works by selecting a representative sample of people eligible to see the advertising.  *Id.*  The sample group is then randomly divided into test and holdout groups.  *Id.*  Causal inference techniques are used to measure the impact of your advertising within the sample group.  *Id.*  "These Brand Lift withholding pertain to Meta's narrative descriptions of budget terms, dollar estimates for advertisement pricing and target audience reach, and partner's account numbers and Campaign identification numbers[.]"  *Id.* ¶ 39; *see also* Exemption 4 *Vaughn* Documents (Ex. 4) at 110, 120–22, 137–38, and 148–49.  This is quintessential Exemption 4 material pertaining to commercial, financial information.  *See, e.g., Flyers Rights Educ. Fund, Inc. v. Fed. Aviation*

*Admin.*, 71 F.4th 1051, 1058 (D.C. Cir. 2023) ("Exemption 4 protects confidential commercial information, not just proprietary technical information."); *CREW v. Dep't of Just.*, 58 F.4th 1255, 1268 (D.C. Cir. 2023) ("Our [Exemption 4] cases consistently consider whether the information in and of itself has a commercial nature or serves a commercial function.").

Disclosure of the information at issue "would provide counterparties and competitors insights into Meta's pricing, product options, and perspectives, unfairly advantaging those entities." Andoh Decl. ¶ 39. Meta has confirmed that it keeps this information confidential. *See, e.g.*, Adams Decl. ¶ 8 ("Meta does not reveal [this] information publicly in the ordinary course."); *id.* ¶ 6 ("Meta customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business."); *see also Flyers Rights*, 71 F.4th at 1055 (For Exemption 4, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it.") (quoting *Argus Leader*, 139 S. Ct. at 2363). Meta has attested that disclosure "would have foreseeable competitive disadvantages to Meta because it may give counterparties and competitors insights into Meta's pricing, product options, and perspectives, unfairly advantaging those entities." *Id.* ¶ 8; *see also Flyers Rights*, 71 F.4th at 1056 (affirming withholding of information under Exemption 4 where business submitter "contends that disclosure would 'undermine [its] competitive position by allowing competitors access to ideas, design details, certification methods, and testing processes'") (alteration in original).

As CDC confirms:

These Brand Lift withholding pertain to Meta's narrative descriptions of budget terms, dollar estimates for advertisement pricing and target audience reach, and partner's account numbers and Campaign identification numbers[.] CDC believes that these materials are confidential because Meta stated in its declaration that the material consisted of sensitive business information and proposed financial terms that have not been publicly disclosed. Based on the information that Meta provided

in its declaration, it is CDC's understanding that this information is commercial because disclosure of this information would have a competitive disadvantage to Meta. CDC further believes that the material being withheld is confidential because Meta informed CDC that it customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business. In its declaration, Meta further explained that disclosing this information would have foreseeable competitive disadvantages for Meta because it would provide counterparties and competitors insights into Meta's pricing, product options, and perspectives, unfairly advantaging those entities.

Andoh Decl. ¶ 39. CDC foresees that disclosure here would cause harm to the agency, in addition to Meta. *Id.* ¶ 40. "If companies do not trust that CDC will protect their confidential business information, then they will not be as forthcoming with CDC, which will cause downstream consequences in a variety of cases having nothing to do with COVID-19 or the particular topics at issue today." *Id.* "Compelled or voluntary disclosure of the materials at issue here would increase the risk that other businesses will refuse to provide information they believe to be confidential to CDC in the future, and CDC foresees that it would be harmed by either voluntarily disclosing this information or by being ordered by the Court to do so." *Id.* "[F]urther release of this material will harm both Meta and, due to concerns about how other businesses will shield information from CDC in the future, CDC itself." *Id.* Accordingly, CDC has properly withheld this material under FOIA Exemption 4.

### B.    CDC's CrowdTangle Withholdings Are Appropriate.

Similarly, CDC has appropriately invoked Exemption 4 for the CrowdTangle materials at pages 199, 219, 226–37, 244–55, 262–72, 294, 296–304, and 315–25. *See generally* Exemption 4 *Vaughn* Documents (Ex. 4). CrowdTangle is Meta's proprietary monitoring tool acquired in 2016 that is designed to help its users track how information spreads online. Andoh Decl. ¶ 41. CrowdTangle provides third parties with access to a subset of public information on Facebook and Instagram with additional performance metrics. *Id.* Meta has attested that these materials "are commercial, in that they are created by Meta in the regular course of business, and the creation

10

and distribution furthers Meta's business goal of offering its users a safe and enjoyable platform." Adams Decl. ¶ 9. These CrowdTangle reports—both the full reports at pages 226–37, 244–54, 262–72, 294,[3] 296–304, and 315–25, and the summaries of those reports at pages 199, 219, and 255, *see generally* Exemption 4 *Vaughn* Documents (Ex. 4)—"were created based on an internally developed set of themes and keywords relating to trending content." Adams Decl. ¶ 9. "Disclosing internal discussions and analysis related to the CrowdTangle reports in full and in aggregate would be commercially detrimental to Meta because it may give insights into how Meta thinks about identifying and searching for viral content." *Id.*; *see also CREW*, 58 F.4th at 1268 ("Our [Exemption 4] cases consistently consider whether the information in and of itself has a commercial nature or serves a commercial function."). Accordingly, CDC understands that these reports are commercial. Andoh Decl. ¶ 43.

These CrowdTangle reports are also kept confidential. *See* Adams Decl. ¶¶ 6, 9. "Meta customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business." *Id.* ¶ 6. Although Meta recognizes that some of the platform content that appears in these reports is publicly viewable, "the sorting criteria and keywords used to select contents and build the reports reflect Meta's proprietary analyses and judgments." *Id.* ¶ 9. In other words, the way the reports are built, as well as the contents contained therein, are confidential even though certain of the information contained in the reports is not. *See*

---

[3]    CDC notes that page 295, which has been disclosed in full, is part of a CrowdTangle report. *See* Exemption 4 *Vaughn* Documents (Ex. 4) at 295. In processing these records, CDC "made every effort to confirm that the materials it is withholding are not already in the public domain and that it is only withholding information that would cause foreseeable harm if disclosed. Where materials have been found to be in the public domain, CDC has lifted those withholdings." Andoh Decl. ¶ 32. To the extent documents have been publicly disclosed in the context of *Missouri v. Biden*, Civ. A. No. 22-1213 (W.D. La.), CDC has endeavored to produce them. *See* Andoh Decl. ¶ 32. CDC reiterates that "adequacy—not perfection—is the standard that FOIA sets." *DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015).

*id.*; *see also Flyers Rights*, 71 F.4th at 1055 (For Exemption 4, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it.") (quoting *Argus Leader*, 139 S. Ct. at 2363).  Disclosure of the reports "in full and in aggregate would be commercially detrimental to Meta because it may give insights into how Meta thinks about identifying and searching for viral content."  Adams Decl. ¶ 9; *see also Flyers Rights*, 71 F.4th at 1056 (affirming withholding of information under Exemption 4 where business submitter "contends that disclosure would 'undermine [its] competitive position by allowing competitors access to ideas, design details, certification methods, and testing processes'") (alteration in original).  Accordingly, CDC understands that these reports are kept confidential.  Andoh Decl. ¶ 44.

Given the foregoing, CDC foresees that disclosure here would cause harm to the agency, not just to Meta.  *Id.* ¶ 40.  "If companies do not trust that CDC will protect their confidential business information, then they will not be as forthcoming with CDC, which will cause downstream consequences in a variety of cases having nothing to do with COVID-19 or the particular topics at issue today."  *Id.*  "Compelled or voluntary disclosure of the materials at issue here would increase the risk that other businesses will refuse to provide information they believe to be confidential to CDC in the future, and CDC foresees that it would be harmed by either voluntarily disclosing this information or by being ordered by the Court to do so."  *Id.*  "[F]urther release of this material will harm both Meta and, due to concerns about how other businesses will shield information from CDC in the future, CDC itself."  *Id.*

Lastly, CDC emphasizes that it has carefully considered whether it could produce in part the CrowdTangle materials that were withheld in full.  As CDC attests:

> With respect to the CrowdTangle reports in particular (pages 226–36, 244–54, 262–72, 294, 296–304, and 315–25 of Exhibit 4), CDC is aware that Plaintiff may

> believe that some portion of these reports should be disclosed, given that CDC has
> disclosed certain related summaries of these reports in this production.  CDC
> responds that the fact that it disclosed other information relevant to the
> CrowdTangle reports demonstrates that it took seriously its disclosure obligations.
> As confirmed in the Adams Declaration, "[a]lthough some platform content
> included in these reports is publicly viewable, the sorting crietaria and keywords
> used to select contents and build the reports reflect Meta's proprietary analyses and
> judgments."  Adams Decl. ¶ 9.  CDC expects that further disclosure of these reports
> would cause foreseeable harm to Meta and that, if further disclosure were
> compelled here, CDC would suffer harm in the future due to businesses being less
> willing to provide their confidential business information to CDC.

Andoh Decl. ¶ 96 (citations cleaned up).  Accordingly, CDC has properly invoked Exemption 4 to

withhold this material.

## II.    <u>Defendant's Withholdings Pursuant to Exemption 5 Are Appropriate.</u>

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would

not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

§ 552(b)(5).  This exemption shields documents of the type that would be privileged in the civil

discovery context, including materials protected by the attorney-client privilege, the attorney

work-product doctrine, and the deliberative-process privilege.  *Nat'l Lab. Rels. Bd. v. Sears,*

*Roebuck & Co.*, 421 U.S. 132, 149 (1975); *Rockwell Int'l Corp. v. Dep't of Just.*, 235 F.3d 598,

602 (D.C. Cir. 2001).  Defendant's Exemption 5 withholdings invoke the deliberative process

privilege.  Andoh Decl. ¶ 17(b).

The deliberative process privilege protects intra- or inter-agency documents that are "both

predecisional and deliberative."  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362

(D.C. Cir. 2021); *accord Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  "A

document is predecisional if it was 'prepared in order to assist an agency decisionmaker in

arriving at his decision,' rather than to support a decision already made."  *Petrol. Info. Corp. v.*

*Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  "Material is deliberative if it 'reflects

the give-and-take of the consultative process.'"  *Id.*  "Examples of predecisional documents

include 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Cleveland v. United States*, 128 F. Supp. 3d 284, 298–99 (D.D.C. 2015) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

The deliberative process privilege protects "materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967)). This privilege rests "on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); *accord Jud. Watch, Inc. v. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021). The deliberative process privilege is designed to prevent injury to the quality of agency decisions by (1) encouraging open, frank discussions on matters of policy between subordinates and superiors; (2) protecting against premature disclosure of proposed policies before they are adopted; and (3) protecting against public confusion that might result from the disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's decision. *See Sears*, 421 U.S. at 151–53; *Coastal States*, 617 F.2d at 866; *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. Inc. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010). The "ultimate aim" of the deliberative process privilege set forth in Exemption 5 is to "prevent injury to the quality of agency decisions." *Petrol. Info.*, 976 F.2d at 1433–34 (internal quotation marks omitted). "There should be considerable deference to the

[agency's] judgment as to what constitutes . . . 'part of the agency give-and-take—of the deliberative process—by which the decision itself is made'" because the agency is best situated "to know what confidentiality is needed 'to prevent injury to the quality of agency decisions.'" *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (quoting *Sears*, 421 U.S. at 151).

In this case, pursuant to the deliberative process privilege, the CDC withheld select material at pages 6, 13–14, 39–43, 46, 84, and 110 of the documents included as Exhibit 3. Andoh Decl. ¶ 17(b). The documents fall into three categories: (1) meeting agendas reflecting the proposed agenda topics that an Interagency Policy Committee and Sub-Interagency Policy Committee of the National Security Council selected for deliberation on ongoing and proposed policy matters, *see* Exemption 5 *Vaughn* Documents (Ex. 3) at 6, 84, 110; (2) a meeting agenda reflecting the proposed agenda topics for a briefing related to disinformation and the United Kingdom, *id.* at 46; and (3) a Summary of Conclusions consisting of selectively culled and summarized information from pre-decisional and deliberative policy conversations and presentations from a June 2, 2021, Sub-Interagency Policy Committee of the National Security Council, a portion of that Summary of Conclusions copied verbatim into an associated email chain, and portions of an email chain referencing pre-decisional and deliberative planning following the referenced meeting, *id.* at 13–14, 39–43. Andoh Decl. ¶ 52(a)–(c).

The National Security Council was involved in the sets of records that were redacted pursuant to FOIA Exemption 5. *Id.* ¶ 55. As a preliminary matter, the National Security Council advises and assists the President in "coordinating executive departments and agencies in the development and implementation of national security policy, and in long-term strategic planning." *Id.* (quoting Memorandum on Renewing the National Security Council System, The White House,

*available     at     https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/04/memorandum-renewing-the-national-security-council-system/*), Feb. 4, 2021 (last accessed July 17, 2024)).  The National Security Council committees were established to convene regularly for the development and implementation of national security policies and to review and coordinate implementation of Presidential decisions.  *Id.*  The Principals Committee of the National Security Council is chaired by the National Security Advisor and consists of senior members of the interagency, including cabinet members.  *Id.*  The Deputies Committee consists of deputy-level members of the interagency and is responsible for reviewing and monitoring the work of the interagency process, including the work of Interagency Policy Committees.  *Id.*  In addition, the Deputies Committee analyzes, distills, and prepares for decision issues being brought before the Principals Committee of the National Security Council.  *Id.*  Finally, Interagency Policy Committees manage the interagency development and implementation of United States Government national security policies.  *Id.*  These Interagency Policy Committees are established to discuss, analyze, and coordinate policies for the senior National Security Council committees. *Id.*  They are regularly convened by Senior Directors in the National Security Council at the Assistant Secretary level.  *Id.*  Sub-Interagency Policy Committees, in turn, similarly conduct policy analysis and provide information and recommendations to inform the broader policy process.  *Id.*  They are often convened by Directors in the National Security Council.  *Id.*

CDC proceeds to address the three categories of records withheld under Exemption 5.

## A.    The Withholdings for the Meeting Agendas of the Interagency Policy Committee and Sub-Interagency Policy Committee Are Appropriate.

First, the CDC appropriately withheld meetings agendas.  Some of the redacted documents—namely, pages 6, 84, and 110 of Exhibit 3—involved the Interagency Policy Committee and Sub-Interagency Policy Committee—more specifically, these pages reflect two

meeting agendas as well as communications related to the meeting agendas regarding the proposed agenda topics that the Sub-Interagency Policy Committee selected for deliberation on ongoing and proposed policy matters.  *See* Andoh Decl. ¶ 56.  In terms of context for the redactions related to these meetings agendas, the Interagency Policy Committee and Sub-Interagency Policy Committee were established by the National Security Council to identify ways to improve and to streamline the efforts of the United States Government to identify, counter, and build resilience to disinformation.  *Id.* ¶ 57.  The Interagency Policy Committee consists of Assistant Secretary or above level members from the federal government interagency.  *Id.*  The role of both the Interagency Policy Committee and Sub-Interagency Policy Committee was to synthesize and analyze information, consider, and deliberate on strategies for countering disinformation, coordinate across the federal government interagency, and make policy recommendations for potential consideration by a Deputies Committee.  *Id.*

In advance of an Interagency Policy Committee and Sub-Interagency Policy Committee meeting, a National Security Council director circulated agendas and suggested topics for the upcoming meetings.  *See, e.g.*, Exemption 5 *Vaughn* Documents (Ex. 3) at 5–6; *see also* Andoh Decl. ¶ 58.  The agendas and suggested topics are pre-decisional because they were prepared before the occurrence of each meeting and were created in anticipation of upcoming Interagency Policy Committee and Sub-Interagency Policy Committee meetings to advise attendees of proposed topics and to provide those attendees with an opportunity to prepare for policy deliberation and discussion.  Andoh Decl. ¶ 58.  The meeting agendas and suggested topics are interagency communications because all the recipients are internal, federal government employees.  *Id.*

17

The meeting agendas are also deliberative.  *Id.* ¶ 59.  In the June 1, 2021 email sent at 9:12 PM (*see* Exemption 5 *Vaughn* Documents (Ex. 3) at 84), the July 6, 2021 email sent at 14:53:28 (*see id.* at 5), and the July 8, 2021, email sent at 22:52:17 (*see id.* at 110), the drafter, who was a National Security Council director, used selectively abbreviated terminology to describe the plan for the intended progression of the meeting, the proposed topics that should be considered, the information that particular participants should be presenting at the respective meetings, and, to varying degrees, the potential policy decisions and considerations that were planned for discussion. Andoh Decl. ¶ 60.

The July 6, 2021, and July 8, 2021, agendas specifically relate to the substantive policies under deliberation at the Interagency Policy Committee and Sub-Interagency Policy Committee. *Id.* ¶ 61.  The deliberative information includes the proposal for which agencies would lead discussions, which decision points were needed to determine which policies to consider, and how those policies should be presented and discussed.  *Id.*

The release of these meeting agendas and suggested topics would disclose the specific nature of the potential discussions and what potential policy matters were planned for deliberation of the Interagency Policy Committee and Sub-Interagency Policy Committee on these specific dates, establishing a specific time in the deliberative process when certain matters were or could have been discussed.  *Id.* ¶ 62.  Release of this type of information, including the timing of when potential policy considerations were or could have been discussed would be harmful because this increases public confusion relating to adoption, failure to adopt, or the length of time needed to properly consider specific policies.  *Id.* ¶ 63.  This, in turn, would chill the deliberative process because it would dissuade National Security Council staff from creating and providing agendas and suggesting topics that include information sufficient to inform productive conversation and

discussion for fear of confusing public stakeholders. *Id.*; *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (affirming grant of summary judgment to the government where the agency "specifically focused on 'the information at issue' in the [documents] under review, and it concluded that disclosure of that information 'would' chill future internal discussions").

In addition, the public release of this type of pre-decisional and deliberative information would harm the deliberative process because it increases the risk that external parties would exert pressure on the Interagency Policy Committee, the Sub-Interagency Policy Committee, the National Security Council staff, specific participants of the meetings, or federal agencies participating in the meetings related to topics in nascent stages of consideration in advance of final decisions on those topics. Andoh Decl. ¶ 64.

It is also foreseeable that the release of this information would harm the National Security Council's deliberative process by harming the ability of employees who are planning meetings to describe in succinct and sufficient terminology the planned topics for discussion and the intended actions for the Interagency Policy Committee and Sub-Interagency Policy Committee. *Id.* ¶ 65. This, in turn, would stifle the open and candid communication of topics for discussion and deliberation and would foreseeably harm the sending and receiving agencies' deliberative process. *Id.* This is because, in the absence of advance notice of topics, the agencies would not be positioned to prepare for fulsome and comprehensive policy discussions at these Interagency Policy Committee and Sub-Interagency Policy Committee meetings. *Id.* Given that these Interagency Policy Committee and Sub-Interagency Policy Committee meetings are designed specifically to gather information and perform deep dives into information to discuss potential

policy recommendations for potential higher-level National Security Council committees, hampering the ability of participants to prepare in advance would be particularly harmful. *Id.*

Finally, the release of these meeting agendas would foreseeably harm the National Security Council's, CDC's, and the federal government's deliberative process because meeting participants would be hesitant to raise topics for discussion at meetings if the unpolished, unvetted, shorthand information created for the purpose of furthering discussion at the meetings were to be made publicly available. *Id.* This hesitancy to raise topics for discussion would, again, harm the National Security Council's ability to conduct full and detailed analyses of policy considerations. *Id.*

In light of the foregoing, the chilling effect detailed above fulfills the requirements of 5 U.S.C. § 552(a)(8)(A)(i)(I). *See Machado Amadis*, 971 F.3d at 370–73. No further information could be disclosed without causing reasonably foreseeable harm. *See* Andoh Decl. ¶¶ 62–65, 97. Because the materials are predecisional and deliberative, the CDC properly withheld this information under Exemption 5.

### B.  The Withholdings Related to the United Kingdom Briefing Agenda Are Appropriate.

Similarly, the CDC has properly withheld an agenda pertaining to an interagency briefing pertaining to the United Kingdom. *See* Andoh Decl. ¶¶ 66–70. On August 2, 2021, in advance of an interagency briefing scheduled to occur on August 10, 2021, which the National Security Council was hosting, a National Security Council director circulated an agenda for the upcoming meeting. Andoh Decl. ¶ 66; *see also* Exemption 5 *Vaughn* Documents (Ex. 3) at 45–46. The agenda is the document at issue here.

The agenda is pre-decisional because it was prepared before the occurrence of the meeting and was created in anticipation of the upcoming briefing to advise attendees of proposed topics

and to provide those attendees with an opportunity to prepare for policy deliberation and discussion. Andoh Decl. ¶ 67. The meeting agenda is an interagency communication because all the recipients are internal, federal government employees. *Id.* ¶ 68.

The meeting agenda is also deliberative. *Id.* ¶ 69. In the August 2, 2021 email sent at 4:50 PM from a National Security Council director to potential participants, the drafter described proposed topics for consideration at the meeting. *Id.*

Release of this information would foreseeably harm the National Security Council's deliberative process because it would discourage National Security Council members and member agencies from openly describing meeting topics. *Id.* ¶ 70; *see also Machado Amadis*, 971 F.3d at 371 (affirming grant of summary judgment to the government where the agency "specifically focused on 'the information at issue' in the [documents] under review, and it concluded that disclosure of that information 'would' chill future internal discussions"). This would, in turn, reduce the ability of members participating in National Security Council briefings and meetings to prepare for meetings and harm the National Security Council's ability to fully formulate and thoroughly discuss policy planning. Andoh Decl. ¶ 70. Accordingly, CDC has appropriately withheld the agenda under FOIA Exemption 5.

### C.    The Withholdings Relating to the Summary of Conclusions Are Appropriate.

Lastly, the CDC appropriately withheld material pertaining to a Summary of Conclusions regarding presentations from the June 2, 2021, Sub-Interagency Policy Committee's June 2, 2021, meeting. *See* Andoh Decl. ¶¶ 71–85; *see also* Exemption 5 *Vaughn* Documents (Ex. 3) at 13–14, 42–43 (same). The context for this Summary of Conclusions is that, on June 2, 2021, the interagency participants in a particular Sub-Interagency Policy Committee met. Andoh Decl. ¶ 72. The goal of this meeting was to gather information, relevant data, and advice to conduct extensive interagency deliberations with the ultimate goal of making recommendations and suggestions to

senior National Security Council committees regarding policy direction. *Id.* After the meeting concluded, a National Security Council director circulated a Summary of Conclusions that provided a selective culling of information from the pre-decisional and deliberative policy conversations. *Id.*; *see also* Exemption 5 *Vaughn* Documents (Ex. 3) at 12 (parent email); *id.* at 13–14 (attachment); *id.* at 42–43 (same). A portion of the Summary of Conclusions was copied verbatim into a separate email to continue conversations with specific agencies regarding planning and coordination. Andoh Decl. ¶ 72; *see also* Exemption 5 *Vaughn* Documents (Ex. 3) at 39–41.

The Summary of Conclusions and the subsequent reproduction of a portion of that Summary of Conclusions are pre-decisional because they (a) reflect deliberative discussions conducted at the Sub-Interagency Policy Committee level before any decisions were made; (b) reflect a summary of discussions provided to committee members to further continued deliberation prior to any decision-making; and (c) reflect the opinions of the drafter in selecting certain information to include in the summary. Andoh Decl. ¶ 73. The Summary of Conclusions is an interagency communication because all the participants in the meeting and all the recipients of the Summary of Conclusions are internal, federal government employees. *Id.* ¶ 74.

The Summary of Conclusions is deliberative because it (a) reflects the exercise of independent judgment and opinion of the employee drafting the summary in the selection, culling, and ordering of the larger universe of material presented, discussed, and deliberated on in the Sub-Interagency Policy Committee meeting; (b) summarizes deliberative discussions on policy considerations of the Sub-Interagency Policy Committee; and (c) is part of the overall National Security Council deliberative process. *Id.* ¶ 75. The drafter of the Summary of Conclusions used their judgment to select pre-decisional and deliberative information presented and discussed at the

meeting as important for further review and discussion. *Id.* ¶ 76. The drafter used their judgment and opinion to draft a summary of the pre-decisional and deliberative discussions. *Id.*

This Summary of Conclusions was then circulated as part of the Sub-Interagency Policy Committees' and the National Security Council's deliberative process. *Id.* ¶ 77. The Sub-Interagency Policy Committee plays a particular role in the National Security Council's deliberative process and makes reports at the appropriate time to higher-level committees within the National Security Council. *Id.* The circulation of this Summary of Conclusions allowed for participants in subsequent meetings to build upon the discussions at this meeting, consider future actions in the information integrity space, and plan for the Sub-Interagency Policy Committee's next steps. *Id.* This summary of the Sub-Interagency Policy Committee's pre-decisional and deliberative discussion, in turn, is part and parcel of the National Security Council's and federal government's deliberative process in formulating information integrity national security policy. *Id.*

The release of this Summary of Conclusions would harm the deliberative process of the National Security Council and agencies of the federal government participating in the meeting by stifling the open and candid conversations of individuals participating in future Sub-Interagency Policy Committee meetings. *Id.* ¶ 78. If the policy considerations and candid discussions were publicly released, participants in future Sub-Interagency Policy Committees would be hesitant to have frank conversations and offer the subjective opinions and advice necessary to facilitate deliberations on well-considered information integrity policy recommendations. *Id.*; *see also Machado Amadis*, 971 F.3d at 371 (affirming grant of summary judgment to the government where the agency "specifically focused on 'the information at issue' in the [documents] under review, and it concluded that disclosure of that information 'would' chill future internal discussions").

This would harm the deliberative process of the Sub-Interagency Policy Committee and the National Security Council because the goal of the Sub-Interagency Policy Committee is to gather information and to vet policy considerations for further recommendation to higher level committees. Andoh Decl. ¶ 78. If the release of a Summary of Conclusions stifled these conversations because individuals feared the release of their thoughts and opinions, the Sub-Interagency Policy Committee would be unable to perform its function in the deliberative process of the National Security Council and federal government. *Id.*

Furthermore, the release of this information would harm the deliberative process of the agency by hindering the ability of agencies to summarize and share selectively culled and curated information for further deliberation and decision making. *Id.* ¶ 79. If the Summary of Conclusions from this Sub-Interagency Policy Committee meeting were released, agency employees would be hesitant to prepare such summaries in the future for fear that the information selected regarding pre-decisional and deliberative interagency discussions on information integrity and similar sensitive topics would be publicly released. *Id.* In the absence of such summaries of prior deliberations and discussions, the Sub-Interagency Policy Committee would be unable to coordinate between meetings, provide participants and absentees with information needed for action items, and plan next steps. *Id.* This is particularly true where, as in the case here, the discussions were in a nascent stage and required extensive additional vetting within the Sub-Interagency Policy Committee before advancing through multiple layers of National Security Council review. *Id.*

Relatedly, information in the June 22, 2021 email at 9:27 AM and the July 13, 2021 email at 2:33:58 (*see* Exemption 5 *Vaughn* Documents (Ex. 3) at 39) discusses pre-decisional and deliberative planning following the referenced Sub-Interagency Policy Committee meeting.

Andoh Decl. ¶ 81. These emails contain communications reflecting the give and take of planning intra- and inter-agency policy direction, suggestions for selecting inter-agency partners for the planning effort, and suggestions for potential international collaboration. *Id.* The email chain is an interagency communication because the senders and participants of the messages are all internal, federal government employees. *Id.* ¶ 82.

The withheld information is pre-decisional because it contains suggestions for further consideration of the recipients. *Id.* ¶ 83. The message and its contents were drafted and sent prior to any decisions being made. *Id.*

The withheld information is deliberative because it contains the thoughts, suggestions, and personal opinions of the sender for consideration of the recipients as they plan follow-up and take next steps after the Sub-Interagency Policy Committee meeting. *Id.* ¶ 84. The content specifically relates to topics for the consideration for the CDC, United States Agency for International Development, and United States Department of State regarding how to implement best practices to counter COVID-related disinformation, suggestions about potential partners for consideration, and suggested means by which these best practices could possibly be shared. *Id.* The message on its face demonstrates its position in the deliberative process by requesting feedback and updates that can be shared with leadership regarding the ongoing work the agencies are conducting. *Id.*

Release of this information would foreseeably harm the deliberative process because participants in the Sub-Interagency Policy Committee would be dissuaded from sharing pre-decisional and deliberative opinions, suggestions, and comments via email. *Id.* ¶ 85. This would hamper the ability of Sub-Interagency Policy Committee to plan, deliberate, and discuss policies and next steps in a fulsome way among the multiple inter-agency members of the committee. *Id.* Similarly, release of the individual opinion of members of the Sub-Interagency Policy Committee

regarding potential partners and whether those partners would be good, or ideas on how to share best practices, would expose that individual to possible repercussions or public backlash regarding choices or opinions expressed. *Id.*

Accordingly, CDC properly applied FOIA Exemption 5 to withhold this material.

**III.    Defendant's Withholdings Pursuant to Exemption 6 Are Appropriate.**

Plaintiff contests the Exemption 6 withholdings asserted in the documents appended at Exhibits 3 and 4 "as it applies to names only (including names appearing in email addresses when the name does not otherwise appear unredacted)." Jt. Status Rep. (ECF No. 24) ¶ 4. Through various supplemental releases, as well as the information appearing in the Andoh Declaration, CDC has now provided Plaintiff with all names that were withheld in these records. *See* Andoh Decl. ¶¶ 13–14, 16, 17(c), 18, 19(a)–(n), 20(c), 21(a)–(e), 90–91. Accordingly, the Court need not address the CDC's Exemption 6 withholdings. *See, e.g.*, *Stein v. CIA*, 454 F. Supp. 3d 1, 16 n.4 (D.D.C. 2020).

Allowing the parties to work cooperatively together to narrow disputes for the Court and to remain focused on the issues of greatest salience is not the same as "grant[ing] judgment 'as conceded' simply because a nonmoving party fails to respond." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016); *see also Am. Ctr. for L. & Just. v. Dep't of Just.*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018) ("[O]nce the parties have appeared in a civil matter, they routinely agree to narrow the issues in dispute or to give up important procedural rights. If they could not, civil litigation would not serve its purpose of offering a 'just, speedy, and inexpensive determination of every action.'") (quoting Fed. R. Civ. P. 1); *King v. Dep't of Just.*, Civ. A. No. 15-1445 (RDM), 2021 WL 3363406, at *4 (D.D.C. Aug. 3, 2021) ("[T]here is an important distinction, especially in a FOIA case, between matters that remain in dispute despite a party's

failure to respond and matters that are not contested at all. The rule that a motion for summary judgment cannot be conceded by a failure to respond 'does not mean . . . that the Court must assess the legal sufficiency of each and every exemption invoked by the government in a FOIA case, regardless of whether the requester contests the government's invocation of that exemption.'") (quoting *Shapiro v. Dep't of Just.*, 239 F. Supp. 3d 100, 106 n.1 (D.D.C. 2017)).

In any event, the CDC emphasizes that the privacy interests here are particularly strong. Andoh Decl. ¶ 92. The CDC has withheld these email addresses and instead provided the names to Plaintiff divorced from their email addresses, "given that disclosure of this information would not contribute to the public's understanding of the operations or activities of the government," "given that the private interest outweighs any potential competing public interest, disclosure of the email address would constitute a clearly unwarranted invasion of personal privacy," and given that the "CDC expects that disclosure would harm the individuals in question." *Id.* "CDC notes that there is a segment of the public that is particularly enraged by the government's response to COVID-19 and that certain individuals have received death threats or other menacing messages due to their involvement in the government's response." *Id.* ¶ 93 (citing BBC, *COVID: Death Threats for Man Who Tried to Debunk Misinformation*, Nov. 30, 2023, https://www.bbc.com/news/av/uk-wales-67570027; Bianca Nogrady, *"I Hope You Die": How the COVID Pandemic Unleashed Attacks on Scientists*, Nature, Oct. 13, 2021, https://www.nature.com/articles/d41586-021-02741-x; Michelle M. Mello, et al., *Attacks on Public Health Officials During COVID-19*, JAMA, Aug. 5, 2020, https://jamanetwork.com/journals/jama/fullarticle/2769291). "CDC is particularly concerned about further disclosing personal identifiable information in this specific environment." *Id.* Accordingly, the CDC has adequately substantiated its Exemption 6 withholdings.

## IV.    **Defendant Has Disclosed All Reasonably Segregable Material.**

CDC has disclosed all reasonably segregable material.  *See* Andoh Decl. ¶¶ 94–96.  "CDC engaged in significant efforts throughout the course of this litigation to lift withholdings for non-exempt material that could be extricated from exempt material."  *Id.* ¶ 94.  CDC has now, after "perform[ing] a line-by-line review of all records," "released all non-exempt material, unless the material is inextricably intertwined with exempt material."  *Id.*  Plaintiff offers no reason to disregard the presumption of good faith afforded to Defendant's declarations.  *See Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1068–69 (D.C. Cir. 2023) ("When an agency demonstrates that a record is exempt, as the [agency] has done, it is 'entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material.'") (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).

Further, CDC has acknowledged that "[e]ven if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects."  *Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024).  CDC has confirmed that it has "carefully considered FOIA's foreseeable harm requirement," Andoh Decl. ¶ 97, and that no further material can be segregated and disclosed, *id.* ¶¶ 94–97.  Accordingly, CDC respectfully submits that it has satisfied its obligations under the FOIA and that the Court should enter summary judgment in its favor.

*    *    *

## CONCLUSION

For all the reasons set forth above, Defendant respectfully requests that this Court grant summary judgment in its favor.

Dated: July 26, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____/s/ *Douglas C. Dreier*_____
DOUGLAS C. DREIER, D.C. Bar #1020234
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2551

*Attorneys for the United States of America*