UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FIRST LEGAL FOUNDATION, ) ) ) ) Plaintiff, ) ) v. ) ) CENTERS FOR DISEASE CONTROL AND PREVENTION, et al ) ) Defendants. ) | Civil Action No. 22-978 |

## DECLARATION OF ROGER ANDOH

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, I, Roger Andoh, declare that the following enumerated statements are true and correct to the best of my knowledge.

1.    I am over 18 years old and competent to testify.

2.    I am submitting this declaration in my capacity as Director of the Freedom of Information Act Office for the Centers for Disease Control and Prevention/Agency for Toxic Substances and Disease Registry ("CDC/ATSDR"), an entity of the U.S. Department of Health and Human Services (HHS). In this capacity, I am the Freedom of Information Officer for CDC/ATSDR.

3.    I have been in my current position since June 2016, and I have personal knowledge of the matters and facts discussed in this declaration and any attachments to this declaration.  I further make this declaration based upon information available to me in my official capacity.

4.    As the FOIA Officer, I supervise and direct the day-to-day activities of the CDC/ATSDR FOIA Office ("CDC-FOIA").  CDC-FOIA is the central office responsible for

responding to requests for information under the FOIA for records from all operating divisions of the CDC and the ATSDR.  FOIA requests are disseminated electronically to areas within the agency that are considered most likely to possess responsive records.  In my position, I determine whether to release or withhold records, or portions of records, in accordance with the FOIA and the HHS implementing regulations.  I also coordinate efforts, as necessary, when one or more of the CDC Centers/Institutes/Offices or one of the ATSDR Divisions is involved in responding to a FOIA request.

5.    Due to the nature of my official duties, I am familiar with the procedures followed by CDC-FOIA in responding to requests for information pursuant to the provisions of FOIA, and specifically, I am familiar with the office's handling of the FOIA request at issue in the above-captioned matter, which is described below.  I have reviewed the documents at issue in the above-captioned litigation.

6.    I make this declaration based upon both my personal knowledge and information that I have received in the course of my official duties as the Freedom of Information Officer for CDC, as well as on the basis of information I have received in conducting these consultations and collecting all of this information.

7.    On July 16, 2021, CDC-FOIA received a FOIA request from Plaintiff via electronic mail ("Plaintiff's FOIA Request").  A copy of Plaintiff's FOIA request is available at ECF No. 1-1.

8.    Plaintiff's FOIA request sought the following documents:

1. All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, of, regarding, referring, or relating to any efforts to flag COVID-19 or COVID-19 vaccine related "misinformation" or "disinformation" to any social media company, including but not limited to Facebook, Twitter, TikTok, Instagram, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest. The

timeframe for this request is January 20, 2021, to date the records request is processed.

2. All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes sufficient to show any and all communications with any social media company, including but not limited to Facebook, Twitter, TikTok, Instagram, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest, regarding any efforts to flag COVID-19 or COVID-19 vaccine related "misinformation" or "disinformation". The timeframe for this request is January 20, 2021, to date the records request is processed.

3. All records, including, but not limited to, communications with any email address for a White House office or individual serving in the White House, including those ending in "@who.eop.gov" or "@nsc.eop.gov" of, regarding, or relating to the "flagging" of "disinformation" to any social media company, including but not limited to Facebook, Twitter, Instagram, TikTok, Snapchat, Reddit, YouTube, LinkedIn, Tumblr, and Pinterest. The timeframe for this request is January 20, 2021, to date the records request is processed.

4. All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes sufficient to show how CDC and/or the Administration will determine the veracity of any given post.

5. All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, sufficient to show who will decide what is "misinformation" and the basis on which they will make that determination.

6. All records, including, but not limited to, electronic mail, texts, memoranda, and handwritten notes, sufficient to show who will decide what is "disinformation" and the basis on which they will make that determination.

7. All communications with any email address ending in "@facebook.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

8. All communications with any email address ending in "@twitter.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

9. All communications with any email address ending in "@instagram.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

10. All communications with any email address ending in "@youtube.com". The timeframe for this request is January 20, 2021, to date the records request is processed.

11. All records sufficient to show the identities of every natural or legal person engaged in "disinformation research and tracking" referenced by Ms. Psaki.

12. All records sufficient to show the identities of each of the "members of our senior staff" referenced by Ms. Psaki.

Id.

9. I understand that the parties have worked together throughout the course of this proceeding to narrow the issues for the Court. As such, "[t]he issues remaining in this case pertain to the propriety of certain redactions that the CDC has made," not issues pertaining to the adequacy of the search, which will accordingly not be discussed further herein. Jt. Status. Rep. (ECF No. 16) ¶ 3.

10. This case has a particularly complex procedural history with respect to the various productions and reproductions that CDC has made as it has attempted to reduce the disputes for the Court. This declaration addresses this history only as necessary for the Court to rule on Defendant's motion.

## THE WITHHOLDINGS IN DISPUTE

11. On November 3, 2023, in accordance with Plaintiff's request, CDC-FOIA agreed to provide Plaintiff with a draft *Vaughn* index covering the withholdings that remain at issue in this litigation. CDC-FOIA thus provided a draft *Vaughn* index for the remaining 5 U.S.C. § 552 Exemptions (b)(5) redactions in the 155-page PDF that Plaintiff previously provided to counsel for CDC during the parties' negotiations and for the remaining 5 U.S.C. § 552 Exemption (b)(4)

redactions in the first four hundred (400) pages of the CDC-FOIA's fifth interim production. CDC-FOIA provided two draft *Vaughn* indices for these withholdings on February 14, 2024.

12.     On March 28, 2024, Plaintiff identified the withholdings in the CDC's draft *Vaughn* indices that remained in dispute.  Specifically, within the CDC-FOIA's two draft *Vaughn* indices, Plaintiff was challenging: (i) all (b)(4) withholdings relating to CrowdTangle and Brand Lift; (ii) all (b)(5) deliberative process withholdings; and (iii) all (b)(6) withholdings as they apply to names only (including names appearing in email addresses when the name does not otherwise appear unredacted).  *See* Jt. Status Rep. (ECF No. 24) ¶ 4.

13.     Since then, CDC has made multiple supplemental productions to lift certain withholdings.

a.  First, on June 4, 2024, CDC lifted certain (b)(5) and (b)(6) withholdings that had been listed in the 155-page *Vaughn* index.

b.  Second, on July 9, 2024, CDC lifted various withholdings.  This production, which had been anticipated in a prior joint status report, *see* Jt. Status Rep. (ECF No. 18) ¶ 4, and which had been inadvertently overlooked previously, lifted many of the (b)(4) withholdings that remained in dispute.

c.  Third, later on July 9, 2024, CDC lifted additional withholdings.  Specifically, this production lifted all withholdings on pages 273 and 295 of CDC's fifth interim production, which pertain to the 400-page *Vaughn* index.

d.  Fourth, on July 17, 2024, CDC lifted an additional withholding.  Specifically, CDC lifted a (b)(6) withholding of an email address on page 154 of CDC's fifth interim production, which pertains to the 400-page *Vaughn* index.

14.     I understand that counsel for the parties have continued to confer in July 2024. On July 9, 2024, Defendant provided Plaintiff with updated *Vaughn* indices that included a column explaining the withholdings that CDC lifted since it initially provided the *Vaughn* indices.  Updated versions of *Vaughn* indices (reflecting additional processing since July 9, 2024) are attached as **Exhibit 1** (155-page) and **Exhibit 2** (400-page).  CDC notes that these *Vaughn* indices include rows for certain pages that no longer have any withholdings, as CDC notes on those *Vaughn* indices whether it lifted the withholdings.

15.     On July 16, 2024, Plaintiff confirmed that it is continuing to challenge each withholding referenced in the two *Vaughn* indices.

16.     CDC is attaching as **Exhibit 3** all 155 pages from the **Exhibit 1** *Vaughn* index, many of which contain no withholdings.  CDC is further attaching as **Exhibit 4** all 400 pages of the **Exhibit 2** *Vaughn* index, many of which contain no withholdings.

17.     Within **Exhibit 3**, CDC asserts that certain material on the following pages is exempt:

    a.  (b)(4): 131 (this is the same page as page 110 of **Exhibit 4**, and this declaration addresses this withholding in the context of **Exhibit 4**);

    b.  (b)(5) (deliberative process): 6, 13-14, 39-43, 46, 84, and 110; and

    c.  (b)(6): 1-7, 10-12, 39-40, 44-46, 82-84, 99-104, 106-110, 112-114, 116-117, 125, 126-138, and 140-150.

18.     Many of the above-referenced (b)(6) withholdings concern information that is not in dispute.  Plaintiff has previously confirmed that it objects to (b)(6) withholdings for "names only (including names appearing in email addresses when the name does not otherwise appear unredacted)."  Jt. Status Rep. (ECF No. 24) ¶ 4.  Thus, (b)(6) withholdings that do not concern

names—such as the Android Mobile phone numbers appearing in, e.g., **Exhibit 3** at 112-114— are not discussed further in Defendant's supporting materials.  Of the (b)(6) withholdings referenced in ¶ 17(c), *supra*, I understand that only the following shield Plaintiff from being able to confirm the name of an individual, and thus only the following would be in dispute: 5 (names of employees of other government agencies, as opposed to employees of HHS/EOP/OSTP, EOP/NSC, and EOP/WHO), 10-11 (same), 44-45 (same), 99-102 (same),[1] and 106-110 (same).

19.    CDC, however, agrees to disclose the names of all individuals who appear in those records.  CDC was just protecting the email addresses due to the significant privacy interests involved.  As Plaintiff has requested only the names, CDC provides the names for those whose email addresses are being withheld below, along with a notation reflecting their email domain or other signifier in the record and thereby make it easier to cross-reference the specific withholdings on the page.  Additional withheld email addresses do not identify names, but rather reflect listservs or are repetitions of names that are already disclosed on the record.

    a.  Page 5: Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); M. MacBride (NTIA); S. Powers (USAGM); K. Neeper (USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffrey Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow

---

[1]    CDC also released the names of EOP/OMB staff for these pages and the other pages where EOP/OMB staff appeared.  The agencies whose staff have been revealed (e.g., U.S. Census Bureau) can be identified on the records themselves.

(FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); Nichol J. (UCIA); Michael Brock (DHS); Elizabeth Phu (OSD); Christopher G. Cain (Military); Greg Johnson (OSD); Gittipong Paruchabutr (Military); Milancy Harris (OSD); and Rodney Patton (NSD).

b. Page 10: Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); Amir Marzouk (State); M. MacBride (NTIA); S. Powers (USAGM); K. Neeper (USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffrery Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); Nichol J. (UCIA); Michael Brock (DHS); Elizabeth Phu (OSD); Tiffany Dowe (unlisted); K Garrison (USAID); Michael Wightman (unlisted); Jonathan Murphy (unlisted); Christopher Cain (Military); Daniel Roh (OSD); Greg Johnson (OSD); Diana Cricien (Federal); Gittipong Paruchabutr (Military); Milancy Harris (OSD); Kiely, Wilkenson (contr-i2o); and Douglas Maughan (unlisted).

c. Page 11 (CDC notes that the same email addresses are typically listed twice in succession on this record): Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); M. MacBride (NTIA); S. Powers (USAGM); K. Neeper

(USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffery Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); and Nichol J. (UCIA).

d.  Page 44: Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); M. MacBride (NTIA); D. Parzik (USAID); S. Powers (USAGM); K. Neeper (USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffery Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); Nichol J. (UCIA); Michael Brock (DHS); Elizabeth Phu (OSD); Joshua Sanders (Military); K Garrison (USAID); Michael Wightman (FBI); Christopher Cain (Military); Daniel Roh (OSD); Greg Johnson (OSD); David Langdon (Federal); Diana Cricien (Federal); Gittipong Paruchabutr (Military); Milancy

Harris (OSD); Michael Dyson (contr-i2o); Kiely Wilkenson (contr-i2o); Douglas Maughan (unlisted); Michael Arnone (Military); Geoffrey Hale (CISA); and Lauran Protentis (unlisted).

e. Page 45: Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); M. MacBride (NTIA); S. Powers (USAGM); K. Neeper (USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffery Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); Michael Brock (DHS); Elizabeth Phu (OSD); Joshua Sanders (Military); Tiffany Dowe (FBI); Jonathan Murphy (unlisted); Christopher Cain (Military); Daniel Roh (OSD); Greg Johnson (OSD); Diana Cricien (Federal); Gittipong Paruchabutr (Military); Michael Dyson (contr-i2o); Kiely Wilkenson (contr-i2o); Douglas Maughan (unlisted); Michael Arnone (Military); and Lauren Protentis (unlisted).

f. Page 99: This is the same email as on page 5.

g. Page 100: This is the same email as on page 10.

h. Page 101: This is the same email as on page 11.

i. Page 102 (CDC notes that there is significant repetition here on this record with the way emails are listed): Michael Brock (DHS); Elizabeth Phu (OSD); Joshua

Sanders (Military); Christopher Cain (Military); Daniel Roh (Military); Greg Johnson (OSD); David Langdon (Commerce); Diana Cricien (Commerce); Gittipong Paruchabutr (Military); Milancy Harris (OSD); Michael Dyson (contr-i2o); Kiely Wilkerson (contr-i2o); Christine Wilkerson (Military); and Margaret Martonosi (NSF).

j.   Page 106: this is the same email as page 44.

k.   Page 107: this is the same email as page 45.

l.   Page 108: this is the same email as pages 101-102.

m.   Page 109: Matthew Tyson (DHS); Christopher Wright (DHS); Shaun Harraden (DHS); M. MacBride (NTIA); S. Powers (USAGM); K. Neeper (USAGM); Mieke Eoyang (Military); Robyn Klein (Military); Damon Bender (Military); Scott Lewis (Military); Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffery Hale (CISA); Allison Snell (CISA); Lauran Protentis (CISA); Robert Schaul (CISA); Marcus Senninger (CISA); Ashley Freitas (CISA); Amanda Curylo (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); James H. (UCIA); Lynn Sicade (DRL); Michael Brock (DHS); Elizabeth Phu (OSD); and Joshua Sanders (Military).

n.   Page 110: Shelby L. (DNI); E. Leer (DNI); Eliza Bao (DNI); Ryan R. (DNI); Nicho. F. (DNI); Rebecca P. (DNI); Robert Kolasky (CISA); Geoffery Hale (CISA); Allison Snell (CISA); Lauran Protentist (CISA); Robert Schaul (CISA);

Marcus Senninger (CISA); Ashley Freitas (CISA); Paul Ahern (Treasury); Robert Obayda (Treasury); Laura Dehmlow (FBI); Cynthia Kaiser (FBI); David Ring (FBI); Brady Olson (FBI); Meredith Burkart (FBI); John Russo (FBI); Jill Vodde (FBI); Michael Brock (DHS); Joshua Sanders (Military); Daniel Roh (unlisted); Greg Johnson (OSD); Gittipong Paruchabutr (Military); Milancy Harris (OSD); Rodney Patton (NSD); Leah Bray (unlisted); Karl Stoltz (Moscow); Nichol J. (UCIA); and James H. (UCIA).

20.    Within **Exhibit 4**, CDC asserts that certain material on the following pages is exempt:

  a.  (b)(4): 110, 120-122, 137-138, 148-149, 199, 219, 226-237, 244-255, 262-272, 294, 296-304, and 315-325;

  b.  (b)(5) (deliberative process): none (there is a stray reference to "(b)(5)" on page 122—"(b)(5); (b)(4)"—CDC confirms that it asserts only (b)(4) to withhold this material); and

  c.  (b)(6): 1, 6-9, 11, 19, 21-25, 80, 87, 89, 91-94, 96, 98-122, 124, 127-150, 152, 154-155, 158-160, 162-164, 166, 177-178, 180-182, 187-189, 191-192, 196, 359-360, and 389.

21.    Of the (b)(6) withholdings in **Exhibit 4**, only the following prevent Plaintiff from being able to confirm the name of an individual, 80, 124, 152, 166, and 359. In reviewing the materials for this production, CDC discovered that its attempt to lift various (b)(6) withholdings during the parties' negotiations did not catch certain (b)(6) withholdings that appeared in the body of emails, as opposed to in the recipient list. For clarity:

a. CDC intended to lift the withholding on page 80, which is not referenced on CDC's *Vaughn* index. The name withheld in-line is: Demi Haynes. If Plaintiff so requests, CDC will reissue that page with the name disclosed.

b. CDC intended to lift the withholding on page 124, which is the same withholding referenced on page 152, neither of which is referenced on CDC's *Vaughn* index. The name withheld in-line is "Carol," as in, "Carol is out for the rest of this week." If Plaintiff so requests, CDC will reissue those pages with the name disclosed.

c. CDC intended to lift the top withholding on page 166 (i.e., the one in the email from Carrie Adams), which is not referenced on CDC's *Vaughn* index. The name withheld in-line is "Payton." For the bottom withholding (i.e., the one in the email from Carol Crawford), CDC confirms that the (b)(6) withholding does not shield a name (instead listing dates she is on leave) and thus is not at issue.

d. CDC intended to lift the withholding on page 359, which is not referenced on CDC's *Vaughn* index. The name withheld in-line is "Utkarsh."

e. Accordingly, with the disclosure of this additional information, CDC understands that the parties do not have any remaining disputes pertaining to FOIA Exemption 6.

**CDC'S WITHHOLDINGS PURSUANT TO FOIA EXEMPTION 4**

22.     FOIA Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

23.    During its review of Meta's records, CDC-FOIA identified specific information as confidential commercial information within the meaning of FOIA Exemption 4.    The information identified consisted of: 1) Meta's narrative description of budget terms, dollar estimates for advertisement pricing and target audience reach; 2) Partner's account numbers and Campaign ID numbers; 3) Meta's CrowdTangle Insights reports; 4) Meta's internal workstreams, tasking priorities, product drafts, and other details relating to the CDC's development of their COVID-19 content; 5) Communications related to Meta's counter-misinformation strategies relating to Covid-19; and 6) Communications and information about technical issues pertaining to Meta resources and infrastructure.    As Plaintiff has limited its challenges to CDC's (b)(4) withholdings to those "relating to Crowdtangle and Brandlift," Jt. Status Rep. (ECF No. 24) ¶ 4, not all of these categories will be discussed further below.

24.    In conformity with Executive Order ("EO") 12600, given that the information that Meta provided to CDC is a business submission from a private business to CDC, CDC was required to verify with the submitter whether it wishes to assert confidentiality of its submission.

25.    In this regard, starting around July 7, 2022, continuing around February 28, 2023, and at other times thereafter, thereafter, CDC-FOIA sent several rounds of an EO 12600 letter to certain private entities that had submitted information responsive to Plaintiff's FOIA request, including Meta, to ascertain if they wished to assert confidentiality, and if so, asking them to substantiate their reasons for asserting confidentiality.

### Meta's FOIA Exemption 4 Materials

26.    In response to the first round of letters, in a correspondence dated March 22, 2023, to CDC-FOIA, acting on behalf of Meta, Carrie Adams, Public Policy Manager from

Meta, asserted confidentiality on the basis of Exemption 4 of the FOIA.  A redacted copy of this correspondence is attached as **Exhibit 5**.

27.    Meta also provided the Declaration of Cariza Adams, dated March 28, 2023, to further support and corroborate the assertions made in Meta's correspondence.  The declaration is also attached to Defendant's motion.

28.    The Adams Declaration confirms:

> 6. . . . *The Materials at issue are commercial or financial in nature.  In addition, Meta customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business. Moreover, for the reasons I explain below, disclosure of the Materials would have various competitive disadvantages for Meta.*
>
> 7.    *Generally, the Record contains information relating to Meta's efforts to combat COVID-19 misinformation on its platforms. Meta's efforts reflect its best attempt to balance values of expression, safety, dignity, authenticity, and privacy.  As relevant here, Meta removes misinformation that is likely directly to contribute to the risk of imminent physical harm, which includes misinformation related to the COVID-19 pandemic.*

Adams Decl. ¶¶ 6–7.

29.    The Adams Declaration uses a pagination different from that in the *Vaughn* index. To reduce confusion, I provide the following cross-reference for those (b)(4) withholdings that remain in dispute, which accurately identifies the pages that the Adams Declaration is referencing:  110, 120-122, 137-138, 148-149, 199, 219, 226-237, 244-255, 262-272, 294, 296-304, and 315-325.

| Page in Exhibit 4 (and on *Vaughn* Index) | Page in Adams Declaration (with Category) |
|---|---|
| 110 | 94 (i.e., "Pricing, terms, and other business information") |
| 120-122 | 104-106 (i.e., "Pricing, terms, and other business information") |
| 137-138 | 121-122 (i.e., "Pricing, terms, and other business information") |
| 148-149 | 132-133 (i.e., "Pricing, terms, and other business information") |

| Page in Exhibit 4 (and on *Vaughn* Index) | Page in Adams Declaration (with Category) |
|---|---|
| 199 | 163 (i.e., "CrowdTangle materials") |
| 219 | 183 (i.e., "CrowdTangle materials") |
| 226-237 | 190-201 (i.e., "CrowdTangle materials") |
| 244-255 | 208-219 (i.e., "CrowdTangle materials") |
| 262-272 | 226-236 (i.e., "CrowdTangle materials") |
| 294 | 258 (i.e., "CrowdTangle materials") |
| 296-304 | 260-268 (i.e., "CrowdTangle materials") |
| 315-325 | 279-289 (i.e., "CrowdTangle materials") |

30.     Ms. Adams also sent letters on behalf of Meta on February 2, 2024 (**Exhibit 6**), and on April 25, 2024 (**Exhibit 7**).  Those letters both reprint the email address that is protected by Exemption 6, so CDC has redacted these two letters insofar as they reprint that email address and other personal identifiable information.

31.     In total, the Adams Declaration, along with the letters, demonstrate that CDC independently investigated Meta's (b)(4) withholdings, repeatedly pushing back and asking for additional information, as opposed to accepting Meta's invocations without question.  This back-and-forth process took well over a year.

32.     CDC notes that it made every effort to confirm that the materials it is withholding are not already in the public domain and that it is only withholding information that would cause foreseeable harm if disclosed.  Where materials have been found to be in the public domain, CDC has lifted those withholdings.

33.    As for the redactions that remain at issue, these fall into two of the several categories that are listed in the Adams Declaration: (1) pricing, terms, and other business information; and (2) CrowdTangle materials.

34.    CDC further incorporates its detailed descriptions of its Exemption 4 withholdings from the respective *Vaughn* index entries in **Exhibit 2.**

*Brand Lift*

35.    Regarding the pricing, terms, and other business information, which, as noted on the *Vaughn* index, concern Brand Lift, Ms. Adams attested that the "Materials contain various sensitive business information and proposed financial terms that should be shielded from public disclosure." More specifically, Ms. Adams explained that:

> The Materials contain various sensitive business information and proposed financial terms that should be shielded from public disclosure. These include a government partner's confidential account number and campaign ID number, as well as estimated dollar figures for ad pricing and target audience reach. In addition, the Materials contain Meta's narrative descriptions of budget terms, offerings, and recommendations. Meta does not reveal such information publicly in the ordinary course. Doing so would have foreseeable competitive disadvantages to Meta because it may give counterparties and competitors insights into Meta's pricing, product options, and perspectives, unfairly advantaging those entities. In addition, disclosing account and campaign ID numbers could have security ramifications both for Meta and its account holders.

> Adams Decl. ¶ 8.

36.    Ms. Adams further attested that "Meta customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business." Adams Decl. ¶ 6.

37.    As Meta explains, "Brand Lift is a kind of lift test where brand polling and other brand awareness measurements are used to help understand the true value of your Meta ads and

how well they perform independent of other marketing efforts.  Brand Lift works by selecting a representative sample of people eligible to see your advertising.  The sample group is then randomly divided into test and holdout groups.  Causal inference techniques are used to measure the impact of your advertising within the sample group."  Meta, *About Brand Lift Tests*, https://www.facebook.com/business/help/1693381447650068 (last accessed July 17, 2024).

38.     Regarding the redacted materials related to BrandLift (i.e., pages 110, 120-122, 137-138, and 148-149), it is CDC-FOIA's position that these materials are commercial because they are created by Meta in the regular course of business, and the creation and distribution of the materials furthers Meta's business goal of offering its users a safe and enjoyable platform.

39.     These Brand Lift withholding pertain to Meta's narrative descriptions of budget terms, dollar estimates for advertisement pricing and target audience reach, and partner's account numbers and Campaign identification numbers, CDC believes that these materials are confidential because Meta stated in its declaration that the material consisted of sensitive business information and proposed financial terms that have not been publicly disclosed.  Based on the information that Meta provided in its declaration, it is CDC's understanding that this information is commercial because disclosure of this information would have a competitive disadvantage to Meta.  CDC further believes that the material being withheld is confidential because Meta informed CDC that it customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business. In its declaration, Meta further explained that disclosing this information would have foreseeable competitive disadvantages for Meta because it would provide counterparties and competitors insights into Meta's pricing, product options, and perspectives, unfairly advantaging those entities.  Adams Decl. ¶ 8.

40.    Congress understood that government agencies need to receive confidential business information from private businesses from time to time in order to fulfill their functions. Congress enacted Exemption 4 to give businesses assurance that their material may be provided to government agencies without it necessarily be disclosed to the world at large.  If companies do not trust that CDC will protect their confidential business information, then they will not be as forthcoming with CDC, which will cause downstream consequences in a variety of cases having nothing to do with COVID-19 or the particular topics at issue today.  Compelled or voluntary disclosure of the materials at issue here would increase the risk that other businesses will refuse to provide information they believe to be confidential to CDC in the future, and CDC foresees that it would be harmed by either voluntarily disclosing this information or by being ordered by the Court to do so.  CDC reiterates that it has engaged in extensive discussions with Meta and has exercised its independent judgment: that judgment is that further release of this material will harm both Meta and, due to concerns about how other businesses will shield information from CDC in the future, CDC itself.

*CrowdTangle*

41.    Regarding the CrowdTangle materials, Ms. Adams explained that CrowdTangle is Meta's proprietary monitoring tool acquired in 2016 and that it is designed to help its users track how information spreads online.  Ms. Adams added that as a tool, CrowdTangle provides third parties with access to a subset of public information on Facebook and Instagram with additional performance metrics.  More specifically for purpose of FOIA Exemption 4, Ms. Adams attested that:

> Materials related to CrowdTangle in the Materials are commercial, in that they are created by Meta in the regular course of business, and the creation and distribution furthers Meta's business goal of offering its users a safe and enjoyable platform. These reports were created based

on an internally developed set of themes and keywords relating to trending content. Although some platform content included in these reports is publicly viewable, the sorting criteria and keywords used to select contents and build the reports reflect Meta's proprietary analyses and judgments. Disclosing internal discussions and analysis related to the CrowdTangle reports in full and in aggregate would be commercially detrimental to Meta because it may give insights into how Meta thinks about identifying and searching for viral content.

Adams Decl. ¶ 9.

42.    Ms. Adams further attested that "Meta customarily and actually treats this kind of information as confidential and does not publicly disclose it in the ordinary course of business." Adams Decl. ¶ 6.

43.    Regarding the redacted materials related to CrowdTangle (i.e., pages 199, 219, 226-237, 244-255, 262-272, 294, 296-304, and 315-325), it is CDC-FOIA's position that these materials are commercial because they are created by Meta in the regular course of business, and the creation and distribution of the materials furthers Meta's business goal of offering its users a safe and enjoyable platform.  Regarding the confidential nature of these materials, based on the information that Meta provided in its declaration, it is my understanding that protecting this information is important because these CrowdTangle reports were created based on an internally developed set of themes and keywords relating to trending content.  Adams Decl. ¶ 9.  CDC further bases its position that the information is confidential on the fact that Meta also informed CDC that, although some platform content included in these reports is publicly viewable, the sorting criteria and keywords used to select contents and build the reports reflect Meta's proprietary analyses and judgments.  Id.  Furthermore, CDC believes that the confidential nature of the materials is justified because Meta also informed CDC that disclosing internal discussions and analysis related to the CrowdTangle reports in full and in aggregate would be commercially

detrimental to Meta because it may give insights into how Meta thinks about identifying and searching for viral content.  Id.

44.     Regarding the confidential nature of these materials, based on the information that Meta provided in its declaration, it is my understanding that protecting this information is important because these CrowdTangle reports were created based on an internally developed set of themes and keywords relating to trending content.  CDC further bases its position that the information is confidential on the fact that Meta also informed CDC that, although some platform content included in these reports is publicly viewable, the sorting criteria and keywords used to select contents and build the reports reflect Meta's proprietary analyses and judgments. Id.  Furthermore, CDC believes that the confidential nature of the materials is justified because Meta also informed CDC that disclosing internal discussions and analysis related to the CrowdTangle reports in full and in aggregate would be commercially detrimental to Meta because it may give insights into how Meta thinks about identifying and searching for viral content.  Id.

*Other Materials*

45.     CDC notes that the other materials described in the Adams Declaration are no longer at issue:

    a.  Regarding the redacted material pertaining to internal workstreams, tasking priorities, product drafts, and other details relating to the CDC's development of their COVID-19 content, CDC has lifted all such redactions.

    b.  Regarding the counter-misinformation strategies relating to Covid-19, CDC has lifted all such redactions.

c.  Regarding the material that pertains to communications and information about technical issues related to Meta resources and infrastructure offerings and recommendations, CDC has lifted all such redactions.

46.  This further demonstrates that CDC has exercised its independent judgment in assessing the applicability of FOIA Exemption 4.

## CDC'S WITHHOLDINGS PURSUANT TO FOIA EXEMPTION 5

47.  Exemption (b)(5) of the FOIA protects "inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

48.  In those cases when information has been withheld or redacted in the records provided to Plaintiff, the deliberative process privilege applied to those materials. The deliberative process privilege protects "advice, recommendations, and opinions that are part of the deliberative, consultative and decision-making process of the government."

49.  In response to Plaintiff's narrowing of the withholdings in dispute, *see* Jt. Status rep. (ECF No. 24) ¶ 4, CDC on June 4, 2024, lifted various Exemption 5 withholdings that had been identified in *Vaughn* index.  The *Vaughn* index attached as **Exhibit 1** includes a column identifying the redactions, remarking if those have been lifted, and the final records themselves appear as **Exhibit 3**.

50.  The remaining Exemption 5 withholdings appear on pages 6, 13-14, 39-43, 46, 84, and 110 of **Exhibit 3**.

51.  CDC does not invoke (b)(5) for any of the **Exhibit 4** records.

52.  With respect to the (b)(5) withholdings that remain in dispute, CDC-FOIA invoked this privilege to protect pre-decisional and deliberative communications like:

a. Meeting agendas reflecting the proposed agenda topics that an Interagency Policy Committee ("IPC") and Sub-Interagency Policy Committee of the National Security Council ("NSC") selected for deliberation on ongoing and proposed policy matters. *See* **Exhibit 3** at 6, 110; *see also id.* at 84 (describing these agenda topics further).

b. One meeting agenda reflecting the proposed agenda topics for a briefing related to United Kingdom disinformation briefing for the United States interagency. *See* **Exhibit 3** at 46.

c. Summary of Conclusions consisting of selectively culled and summarized information from pre-decisional and deliberative policy conversations and presentations from the June 2, 2021 Sub-IPC of the NSC, a portion of that Summary of Conclusions copied verbatim into an associated email chain, and portions of an email chain referencing pre-decisional and deliberative planning following the referenced Sub-IPC meeting. *See* **Exhibit 3** at 13-14, 39-41, 42-43.

53.    CDC further incorporates its detailed descriptions of these withholdings from the respective *Vaughn* index entries in **Exhibit 1**.

54.    Here, FOIA Exemption (b)(5) was applied to protect pre-decisional, deliberative communications among interagency staff participating in the IPC and Sub-IPC regarding the analysis, planning, resourcing, and policy options for consideration of the IPC and Sub-IPC to make recommendations to higher-level NSC committees. In addition, FOIA Exemption (b)(5) was applied to protect pre-decisional, deliberative communications among interagency staff participating in a briefing arranged by the NSC relating to the United Kingdom's efforts to counter disinformation.

55.    The NSC was involved in the sets of records that were redacted pursuant to FOIA Exemption (b)(5).  For purposes of background, I was informed that the NSC advises and assists the President in "coordinating executive departments and agencies in the development and implementation of national security policy, and in long-term strategic planning."  Memorandum on Renewing the NSC System ("NSM-2"), The White House, *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/04/memorandum-renewing-the-national-security-council-system/, Feb. 4, 2021 (last accessed July 17, 2024).  I understood that, consistent with the NSM-2, the NSC committees were established to convene regularly for the development and implementation of national security policies and to review and coordinate implementation of Presidential decisions.  Id.  The Principals Committee of the NSC is chaired by the National Security Advisor and consists of senior members of the interagency, including cabinet members. The Deputies Committee consists of deputy-level members of the interagency and is responsible for reviewing and monitoring the work of the interagency process, including the work of Interagency Policy Committees (IPCs).  In addition, the Deputies Committee analyzes, distills, and prepares for decision issues being brought before the Principals Committee or the NSC.  Finally, IPCs manage the interagency development and implementation of United States Government national security policies.  Id.  These IPCs are established to discuss, analyze, and coordinate policies for the senior NSC committees. They are regularly convened by Senior Directors in the NSC at the Assistant Secretary level. Sub-IPCs, in turn, similarly conduct policy analysis and provide information and recommendations to inform the broader policy process. They are often convened by Directors in the NSC.

*Meeting Agendas*

56.     As stated above, some of the redacted documents involved the IPC and Sub-IPC, more specifically two meeting agendas as well as communications related to the meeting agendas reflecting the proposed agenda topics that the Sub-IPC of the NSC selected for deliberation on ongoing and proposed policy matters.

57.     In terms of context for the redactions related to these meetings agendas, the IPC and the Sub-IPC were established by the NSC keeping with NSM-2 to identify ways to improve and to streamline the efforts of the U.S. government to identify, counter, and build resilience to disinformation.  The IPC consists of Assistant Secretary or above level members from the federal government interagency.   The role of both the IPC and the Sub-IPC was to synthesize and analyze information, consider, and deliberate on strategies for countering disinformation, coordinate across the federal government interagency, and make policy recommendations for potential consideration by a Deputies Committee.

58.     In advance of an IPC and a Sub-IPC meeting, an NSC director circulated agendas and suggested topics for the upcoming meetings.  *See, e.g.*, **Exhibit 3** at 5-6.  The agendas and suggested topics are pre-decisional because they were prepared before the occurrence of each meeting and were created in anticipation of upcoming IPC and Sub-IPC NSC meetings to advise attendees of proposed topics and to provide those attendees with an opportunity to prepare for policy deliberation and discussion.

59.     The meeting agendas and suggested topics are interagency communications because all the recipients are internal, federal government employees.

60.     The meeting agendas are also deliberative.  In the June 1, 2021 email sent at 9:12 PM (*See* **Exhibit 3** at 84), the July 6, 2021 email sent at 14:53:28 (*see* **Exhibit 3** at 5), and the

July 8, 2021 email sent at 22:52:17 (*see* **Exhibit 3** at 110) from an NSC director, to potential participants, the drafter used selectively abbreviated terminology to sufficiently describe the plan for the intended progression of the meeting, what proposed topics should be considered, which participants should be presenting information at the respective meetings, and to varying degrees what potential policy decisions and considerations were planned for discussion.

61.     The July 6, 2021, and July 8, 2021, agendas specifically relate to the substantive policies under deliberation at the IPC and the Sub-IPC.  The deliberative information includes the proposal for which agencies would lead discussions, which decision points were needed to determine which policies to consider, and how those policies should be presented and discussed.

62.     The release of these meeting agendas and suggested topics would disclose the specific nature of the potential discussions and what potential policy matters were planned for deliberation of the IPC and the Sub-IPC on these specific dates, establishing a specific time in the deliberative process when certain matters were or could have been discussed.

63.     Release of this type of information, including the timing of when potential policy considerations were or could have been discussed would be harmful because this increases public confusion relating to adoption, failure to adopt, or the length of time needed to properly consider specific policies.  This, in turn, would chill the deliberative process because it would dissuade NSC staff from creating and providing agendas and suggesting topics that include information sufficient to inform productive conversation and discussion for fear of confusing public stakeholders.

64.     In addition, the public release of this type of pre-decisional and deliberative information would harm the deliberative process because it increases the risk that external parties would exert pressure on the IPC, the Sub-IPC, the NSC staff, specific participants of the

meetings, or federal agencies participating in the meetings related to topics in nascent stages of consideration in advance of final decisions on those topics.

65.     It is also foreseeable that the release of this information would harm the NSC's deliberative process by harming the ability of employees who are planning meetings to describe in succinct and sufficient terminology the planned topics for discussion and the intended actions for the IPC and Sub-IPC.  This, in turn, would stifle the open and candid communication of topics for discussion and deliberation and would foreseeably harm the sending and receiving agencies' deliberative process.  This is because, in the absence of advance notice of topics, the agencies would not be positioned to prepare for fulsome and comprehensive policy discussions at these IPC and Sub-IPC meetings.  Given that these IPC and Sub-IPC meetings are designed specifically to gather information and perform deep dives into information to discuss potential policy recommendations for potential higher-level NSC committees, hampering the ability of participants to prepare in advance would be particularly harmful.  Finally, the release of these meeting agendas would foreseeably harm the NSC's, CDC's, and the federal government's deliberative process because meeting participants would be hesitant to raise topics for discussion at meetings if the unpolished, unvetted, shorthand information created for the purpose of furthering discussion at the meetings were to be made publicly available.  This hesitancy to raise topics for discussion would, again, harm the NSC's ability to conduct full and detailed analyses of policy considerations.

*UK Briefing Agenda*

66.     On August 2, 2021, in advance of an interagency briefing scheduled to occur on August 10, 2021, hosted by the NSC, an NSC director circulated an agenda for the upcoming meeting.  *See* **Exhibit 3** at 45-46.

67.     The agenda is pre-decisional because it was prepared before the occurrence of the meeting and was created in anticipation of the upcoming briefing to advise attendees of proposed topics and to provide those attendees with an opportunity to prepare for policy deliberation and discussion.

68.     The meeting agenda is an interagency communication because all the recipients are internal, federal government employees.

69.     The meeting agenda is also deliberative.  In the August 2, 2021 email sent at 4:50 PM from an NSC director to potential participants, the drafter described proposed topics for consideration at the meeting.

70.     Release of this information would foreseeably harm the NSC's deliberative process because it would discourage NSC members and member agencies from openly describing meeting topics.  This would, in turn, reduce the ability of members participating in NSC briefings and meetings to prepare for meetings and harm the NSC's ability to fully formulate and thoroughly discuss policy planning.

*Summary of Conclusions and Related Correspondence*

71.     As stated earlier, some of the redacted documents involved one Summary of Conclusions consisting of selectively culled information from pre-decisional and deliberative policy conversations and presentations from the June 2, 2021, Sub-IPC of the NSC.  *See* **Exhibit 3** at 13-14, 42-43 (same).

72.     The context for this Summary of Conclusions is as follows: on June 2, 2021, the interagency participants in a particular Sub-IPC met.  As previously noted, the goal of these Sub-IPC meetings was to gather information, relevant data, and advice to conduct extensive interagency deliberations with the ultimate goal of making recommendations and suggestions to

senior NSC committees regarding policy direction.  After the afore-mentioned Sub-IPC meeting concluded, an NSC director circulated a Summary of Conclusions that provided a selective culling of information from the pre-decisional and deliberative policy conversations.  *See, e.g.*, **Exhibit 3** at 12 (parent email); *id.* at 13-14 (attachment).   A portion of the Summary of Conclusions was copied verbatim into a separate email to continue conversations with specific agencies regarding planning and coordination.  *See* **Exhibit 3** at 39-41.

73.    I was informed that the Summary of Conclusions and the subsequent reproduction of a portion of that Summary of Conclusions are pre-decisional because they (a) reflect deliberative discussions conducted at the Sub-IPC level before any decisions were made; (b) reflect a summary of discussions provided to committee members to further continued deliberation prior to any decision-making; (c) reflect the opinions of the drafter in selecting certain information to include in the summary.

74.    The Summary of Conclusions is an interagency communication because all the participants in the meeting and all the recipients of the Summary of Conclusions are internal, federal government employees.

75.    The Summary of Conclusions is deliberative because it (a) reflects the exercise of independent judgment and opinion of the employee drafting the summary in the selection, culling, and ordering of the larger universe of material presented, discussed, and deliberated on in the Sub-IPC meeting; (b) summarizes deliberative discussions on policy considerations of the Sub-IPC; and (c) is part of the overall NSC deliberative process.

76.    The drafter of the Summary of Conclusions used his or her judgment to select pre-decisional and deliberative information presented and discussed at the Sub-IPC meeting as

important for further review and discussion.  The drafter used his or her judgment and opinion to draft a summary of the pre-decisional and deliberative discussions.

77.    This Summary of Conclusions was then circulated as part of the Sub-IPC's and NSC's deliberative process.  As previously noted, the Sub-IPC plays a particular role in the NSC's deliberative process and makes reports at the appropriate time to higher-level committees within the NSC.  The circulation of this Summary of Conclusions allowed for participants in subsequent meetings to build upon the discussions at this meeting, consider future actions in the information integrity space, and plan for the Sub-IPC's next steps.  This summary of the Sub-IPC pre-decisional and deliberative discussion, in turn, is part and parcel of the NSC's and federal government's deliberative process in formulating information integrity national security policy.

78.    The release of this Summary of Conclusions would harm the deliberative process of the NSC and agencies of the federal government participating in the meeting by stifling the open and candid conversations of individuals participating in future Sub-IPC meetings.  Stated differently, if the policy considerations and candid discussions were publicly released, participants in future Sub-IPCs would be hesitant to have frank conversations and offer the subjective opinions and advice necessary to facilitate deliberations on well-considered information integrity policy recommendations.  This would harm the deliberative process of the Sub-IPC and the NSC because the goal of the Sub-IPC is to gather information and to vet policy considerations for further recommendation to higher level committees.  If the release of a Summary of Conclusions stifled these conversations because individuals feared the release of their thoughts and opinions, the Sub-IPC would be unable to perform its function in the deliberative process of the NSC and federal government.

79.     Furthermore, the release of this information would harm the deliberative process of the agency by hindering the ability of agencies to summarize and share selectively culled and curated information for further deliberation and decision making.    If the Summary of Conclusions from this Sub-IPC meeting were released, agency employees would be hesitant to prepare such summaries in the future for fear that the information selected regarding pre-decisional and deliberative interagency discussions on information integrity and similar sensitive topics would be publicly released.    In the absence of such summaries of prior deliberations and discussions, the Sub-IPC would be unable to coordinate between meetings, provide participants and absentees with information needed for action items, and plan next steps.    This is particularly true where, as in the case here, the discussions were in a nascent stage and required extensive additional vetting within the Sub-IPC before advancing through multiple layers of NSC review.

80.     As noted previously, the email chain attaching one instance of the Summary of Conclusions from the June 2, 2021 Sub-IPC, contains a portion of the Summary of Conclusions copied verbatim into the text of the email.    For the reasons discussed above related to the full Summary of Conclusions, this information is pre-decisional, deliberative, and its release would foreseeably harm the NSC and federal interagency.

81.     In addition, information in the June 22, 2021 email at 9:27 AM and July 13, 2021 at 2:33:58 (*see* **Exhibit 3** at 39) discusses pre-decisional and deliberative planning following the referenced Sub-IPC meeting.    These emails contain communications reflecting the give and take of planning intra- and inter-agency policy direction, suggestions for selecting inter-agency partners for the planning effort, and suggestions for potential international collaboration.

82.     The email chain is an interagency communication because the senders and participants of the messages are all internal, federal government employees.

83.     The withheld information is pre-decisional because it contains suggestions for further consideration of the recipients.  The message and its contents were drafted and sent prior to any decisions being made.

84.     The withheld information is deliberative because it contains the thoughts, suggestions, and personal opinions of the sender for consideration of the recipients as they plan follow-up and take next steps after the Sub-IPC meeting.  The content specifically relates to topics for the consideration for the CDC, United States Agency for International Development, and United States Department of State regarding how to implement best practices to counter COVID-related disinformation, suggestions about potential partners for consideration, and suggested means by which these best practices could possibly be shared.  The message on its face demonstrates its position in the deliberative process by requesting feedback and updates that can be shared with leadership regarding the ongoing work the agencies are conducting.

85.     Release of this information would foreseeably harm the deliberative process because participants in the Sub-IPC would be dissuaded from sharing pre-decisional and deliberative opinions, suggestions, and comments via email.  This would hamper the ability of Sub-IPC to efficiently and effectively plan, deliberate, and discuss policies and next steps in a fulsome way among the multiple inter-agency members of the committee.  Similarly, release of the individual opinion of members of the Sub-IPC regarding potential partners and whether those partners would be good, or ideas on how to share best practices, would expose that individual to possible repercussions or public backlash regarding choices or opinions expressed.

*Segregability*

86.     Regarding segregability, to the extent there is factual information included in the Summary of Conclusions, that information is so extensively intertwined with policy deliberations

that it is unable to be segregated.  The very selection of information, factual or otherwise, by the employee preparing the summary of conclusions goes to what information the Sub-IPC was considering in its policy deliberation process.

87.     All segregable information in the email chain, with the top-level message of July 13, 2021 at 2:33:58 from the NSC director (**Exhibit 3** at 39) has been released.

88.     Similarly, to the extent there is factual information contained in the agendas, such as the title of an agency associated with a topic, that information is so intertwined with policy deliberations that it is unable to be segregated.  The selection of a particular agency or the timing of policy deliberations is integral to the deliberative process as explained above.

### CDC'S WITHHOLDINGS PURSUANT TO FOIA EXEMPTION 6

89.     Exemption 6 mandates the withholding of information that if disclosed "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

90.     In response to Plaintiff's narrowing of the withholdings in dispute, *see* Jt. Status rep. (ECF No. 24) ¶ 4, Defendant on June 4, 2024, lifted various Exemption 6 withholdings that had been identified in its *Vaughn* index (Ex. 3).

91.     As stated above, CDC has disclosed all names within the records located at **Exhibit 3** and **Exhibit 4**, either in the records themselves or in this declaration.  Accordingly, CDC understands that it has resolved the parties' dispute pertaining to Exemption 6.

92.     Nonetheless, I want to emphasize that the privacy interests here are strong.  For the email addresses that CDC has withheld, Plaintiff has not demonstrated a FOIA public interest in disclosure, given that disclosure of this information would not contribute to the public's understanding of the operations or activities of the government.  As a result of the above, given that the private interest outweighs any potential competing public interest, disclosure of the email

address would constitute a clearly unwarranted invasion of personal privacy, and CDC expects that disclosure would harm the individuals in question.

93.     CDC notes that there is a segment of the public that is particularly enraged by the government's response to COVID-19 and that certain individuals have received death threats or other menacing messages due to their involvement in the government's response.  *See, e.g.*, BBC, *COVID: Death Threats for Man Who Tried to Debunk Misinformation*, Nov. 30, 2023, https://www.bbc.com/news/av/uk-wales-67570027; Bianca Nogrady, *"I Hope You Die": How the COVID Pandemic Unleashed Attacks on Scientists*, Nature, Oct. 13, 2021, https://www.nature.com/articles/d41586-021-02741-x; Michelle M. Mello, et al., *Attacks on Public Health Officials During COVID-19*, JAMA, Aug. 5, 2020, https://jamanetwork.com/journals/jama/fullarticle/2769291.   CDC is particularly concerned about further disclosing personal identifiable information in this specific environment.   CDC fears that further disclosure risks increasing the likelihood that a criminal would cause death or serious physical or emotional injury to these individuals.

## SEGREGABILITY AND FORESEEABLE HARM

94.     CDC has performed a line-by-line review of all records in **Exhibit 3** and **Exhibit 4**.   CDC has released all non-exempt material, unless the material is inextricably intertwined with exempt material.   CDC engaged in significant efforts throughout the course of this litigation to lift withholdings for non-exempt material that could be extricated from exempt material.   As a result of this back-and-forth process, the records went through several rounds of review and reprocessing.   The records themselves demonstrate that only select portions of materials were withheld.

95.    Only a handful of records needed to be withheld in full—namely, pages 14 and 43 of **Exhibit 3**, and pages 226-236, 244-254, 262-272, 294, 296-304, and 315-325 of **Exhibit 4**. These records are all addressed above, but CDC emphasizes that it has carefully examined each of these pages (as it did all pages in these productions) to determine whether these pages could be produced in part without causing foreseeable harm.  CDC determined that no further material could be disclosed without causing foreseeable harm.

96.    With respect to the CrowdTangle reports in particular (pages 226-236, 244-254, 262-272, 294, 296-304, and 315-325 of **Exhibit 4**), CDC is aware that Plaintiff may believe that some portion of these reports should be disclosed, given that CDC has disclosed certain related summaries of these reports in this production.  CDC responds that the fact that it disclosed other information relevant to the CrowdTangle reports demonstrates that it took seriously its disclosure obligations.    As confirmed in the Adams Declaration, "[a]lthough some platform content included in these reports is publicly viewable, the sorting crietaria and keywords used to select contents and build the reports reflect Meta's proprietary analyses and judgments."  Adams Decl. ¶ 9.  CDC expects that further disclosure of these reports would cause foreseeable harm to Meta and that, if further disclosure were compelled here, CDC would suffer harm in the future due to businesses being less willing to provide their confidential business information to CDC.

97.    CDC confirms that it has carefully considered FOIA's foreseeable harm requirement.  The various harms expected to ensue are described in detail above and in CDC's *Vaughn* indices.

## CONCLUSION

98.    As a result, CDC avers that it provided evidence that it complied with FOIA, and adequately discharged its FOIA obligations.

99.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing to be true and correct, to the best of my knowledge, information and belief.

Dated: July 26, 2024

_Roger Andoh_
_____
Roger Andoh